Number 22-407, Saba Capital versus Naveen Floating Rate Income Fund. The question in this case is whether the Investment Company Act requires a closed-end fund to allow arbitrage investors to buy large swaths of shares and use those concentrated holdings to fundamentally alter the very essence of the fund and then cash out for short-term gain. Well, the ICA doesn't talk about anything but their right to buy the shares. You added a whole sentence about what their goal was. That's not in the ICA. Well, the ICA has a provision that talks about all shares being voting shares. Right. That provision does not prohibit restrictions on shareholders, which is what the control share amendment at issue in this case has done. Well, it doesn't limit the reason why someone buys a share and wants to vote it, does it? I mean, I want to buy a share because, well, me, I want to make some money. But somebody else who's better capitalized than me might buy 100,000 shares because they want to do something with regard to control of the company. Do the same, transmit it into mutual funds. I want to have a say in how the mutual funds run. The ICA doesn't say if I want to do that, then somehow my voting rights can be impaired, does it? Well, what the- Does it? Well, I think it does- It does not. I think the ICA does allow for restrictions on shareholders and those restrictions on shareholders, and the ICA in particular allows that because of the purposes section in the ICA in which the statute- When someone buys a share with the current board of trustees or board resolution in place, when someone buys a share and it constitutes 9.999% plus 1, so therefore it clicks to 10%, can that share be voted at the moment it's acquired? There's a vote going on among the shareholders, and the polls are open for two days, three days. And so I buy my share on day one, and I can vote, and the voting's open until day three. But my share clicks me over to 10%. Can I vote? I cannot vote, can I? You cannot vote, but the reason that you cannot vote is not because of a restriction on the share, it is because- It feels like restriction on the share that I just bought because the share, it doesn't get me a right to vote, whereas if it was 9.998, I could vote it. I don't think it is a restriction on the share because- Doesn't it feel like if it's 9.998 as opposed to 10, the 9.998 can vote and 10 can't? Corporate law has long addressed this precise distinction. So I buy two shares, one that takes me to 9.999, and one that takes me to 10. I can vote the one, I can't vote the other. I'm the same shareholder. Either share in the hands of somebody who doesn't cross that 10% threshold can presently be voted. But I can vote one, I can't vote the other. So I'm the same shareholder, and I've got two shares. One I can vote, the other I cannot. But the reason that you can vote one and not the other is the shareholder's conduct. I feel the same. Can't the amendment be acting on both the shareholder and the share? It doesn't seem like it's a either or. It seems like there's overlap in how this is working. I don't think there is. The amendment itself specifically says that it does not restrict the voting rights of shares. That it's only acting on the shareholder. And the distinction, again, the Delaware Supreme Court drew this distinction in the Baker case as a matter of fundamental corporate law. The very same share in the hands of somebody who didn't commit the same conduct, that is, acquiring above a certain threshold, the very same share would be votable. What the ICA is prohibiting in section 18I is having a class of shares that categorically has fewer voting rights than another class. It imputes to someone who buys 10% some kind of ill motive. I'm sorry, I didn't hear the question. It imputes to someone who owns 10% an ill motive. What's the connection? The statute doesn't recognize that. Well, I think that the problem that the statute was trying to solve, one of the problems. It sounds more like an attempt to restrict someone who just happens to own 10%, regardless of their motives. It is, isn't it? I mean, it doesn't measure their motives at all. They could be the most wonderful person in the world. They're just interested in getting their dividends. But they don't. They can't vote. So the resolution discriminates against folks who have no interest in being raiders. The reason that the resolution, the ICA, if you look at the purposes and policy section of the ICA, this is an unusual statute because it directs courts to interpret. Yeah, it directs everybody to be treated equally. What an unusual statute. Well, it directs courts to interpret the statute in light of particular findings and purposes that Congress enumerated. Those findings and purposes include that the fund is to be managed in the interest of all shareholders, not just in the interest of concentrated shareholders above a 5% threshold. That's one of the purposes that Congress had to put in place in passing this statute. It was solving a particular problem that, following the stock market crash in 1929, you had concentrated- It could have enacted something like the Delaware statute that allowed the restricting of voting shares, but it didn't. And they certainly didn't put the purposes in the words of the statute, did they? Well, it actually did put the purposes in the words of the statute. That's section one, which, again, directs courts to interpret the statute in light of its purposes. Congress didn't need to- So you want us to have graphed some kind of 10% rule onto the equal voting shares? No. First of all, the 10% rule is coming from the control share amendment. The control share amendment is not prohibited by the ICA is the point. We know that it's not prohibited by the ICA because- for several reasons. One, section 18I specifically addresses shares in stock, not shareholders. That has to be read against the background principle of corporate law in cases like Baker from the Delaware Supreme Court, which recognized that a restriction on shareholders based on acquiring a certain volume of shares is entirely consistent with a law that requires that shares have equal voting rights. Counsel? There's a distinction between shares and shareholders. I don't want to interrupt you, but English is my native language, and I don't understand the difference between a shareholder and a share. Perhaps you could elucidate for me. I think, again, I would look at the Baker decision. I would look at Judge Posner's decision from Dynamics Corporation. There's a difference between the personal right of the stockholder to exercise a power, and that personal right may be affected by the stockholder's conduct versus- But isn't the personal right also inherent in the share of stock that that person purchased? I don't think it is because if somebody else held that very same share, they could vote it. What this statute is getting at is a class of shares that, no matter who holds it, can't be voted or can't be voted equally to others. That's not what's going on here. And the other point that I would emphasize is that in section 12D1, Congress did specifically put shareholder restrictions in place, and those 12D1 restrictions are consistent with 18I, which shows us two things. One, 18I is dealing with just shares, not shareholders, given what Congress did in 12D1. Two, when Congress specifically wanted to address shareholder restrictions, it knew how to do that. That's what it did in 12D1. That's not what it did in 18I, where it talked about shares and stock, which are terms that have to be understood in light of background corporate law principles. We'll give you a few extra minutes because there's some other issues to get to. But before we move off this topic, is there anything you want to say about the 2010 Boulder letter from the SEC? What did we make of that? And it seems to adopt the position, or it seems to have adopted the position, that the district court's interpretation of the ICA. The 2010 Boulder letter does adopt that position, but that has since been withdrawn. And in any event, these no-action letters are only entitled to deference commensurate with their power to persuade. Do we know why it was withdrawn? Do you have any sense, anything you can tell us about what the SEC's view is on this? I don't know what the SEC's view is. There is a letter withdrawing the 2010 letter. But it doesn't explain what's going on? Just, I think, that the SEC has reconsidered and is withdrawing that letter. Can I ask about standing? I just want to make sure I understand your argument. If SAVA had actually bought the extra share, a couple of shares, to trigger the amendment, do you dispute that there would be injury then? If they had actually purchased the shares? Correct. I mean, they stopped just short, right, of triggering the threshold. I still think at that point that it would be speculative whether they are actually going to be denied the right to vote as part of a shareholder vote. The default is they don't vote until there's a vote, correct, of the shareholders not so incumbent? Right, but I think that as a practical matter, what would happen is before there would be any opportunity to have a substantive vote, you would have a shareholder meeting at which the first order of business would be a vote among the disinterested shareholders about whether these- Is that required in the bylaws? Is the vote of the remaining majority required after someone acquires a 10% controlled share? I believe that the way this works under the bylaws is that the new concentrated shareholder can call for that shareholder vote, and that then has to be the first order of business. It then has to occur? I believe so. You'll tell me on rebuttal the page that you're going to reference, right? Yes, I'll- So at that point then, if the vote says they don't get to vote, then there would be injury? But if it's thumbs up they do, then there's no injury? Is that your position? I think that's right, but of course, as it's baked into Your Honor's question, in this case, not only did they not purchase the shares, they also didn't ask for a procedure that the bylaws provide that is essentially for an advisory opinion about whether they would be allowed to purchase the shares if they did so. So it's doubly speculative. There was an available procedure to them that would have allowed them to know in advance whether they would be allowed to vote shares if they acquired them. They didn't take advantage of that procedure. They don't point to any history in which a concentrated shareholder has been denied the right to vote those shares, and so it's simply speculative whether they would suffer any injury. But you must have thought, your client must have thought the threat was somewhat imminent. That's why they passed the resolution, right? The threat of this kind of activity. Yes, and it was meant to deter this kind of activity that would, again, SABA has a history. SABA already owns 10% of some of the funds, does it not? Yes, but the way the control share amendment operates is. No, I understand that they're not so encumbered, but what I'm saying is that your brief seems to indicate that this resolution was in response to some of SABA's activity. Is that true? I think it is in response to it, but this is not it. I guess your board thought that SABA's activity was somewhat imminent, then, wasn't it? Not to the point of constitutional injury. I mean, boards might pass all sorts of resolutions to deal with contingencies. That's what prudent boards would do. That doesn't mean that it's imminent enough to be a cognizable constitutional injury. Counsel, thank you. Do you have any specific objection to the district court's granting rescission that you didn't like it, but do you have any specific objection to the methodology or the law on which you relied? We do, Judge Pooler. So the ICA's rescission provision is another unusual feature of this statute, right? It says that a court can't deny rescission unless the court finds that under the circumstances, that's a fact-bound test, the denial of rescission would produce a more equitable result than its grant. The problem here is that the district court ignored that question entirely. It granted summary judgment for SABA. It says if it denies rescission, it granted rescission here. The court granted, right, the court granted rescission here. The point being it's not allowed, it's not permitted under this statute to grant rescission unless that is what would produce the more- Either way though, the test under the statute is that the court has to ask the question, what would produce the more equitable result under the circumstances? And the court here denied discovery and ignored the equities that the statute is calling for it to weigh. So you're just asking for us to remand this to Judge Atkin so he could mention section 80A-46B2, would that satisfy your objection? No, Judge Poore, what this statute would require Judge Atkin to do is to allow discovery into the circumstances of this case and to make a determination whether on those facts rescission would be the more equitable result or whether leaving the control share amendment in place would be the more equitable result. Doesn't the decision speak for itself? I'm sorry? The more equitable conclusion to grant rescission? No, Your Honor. First of all, the district court did not actually make any findings on this. Second, the district court did not allow discovery into what would be more equitable under these circumstances, which could include discovery into Saba's history with funds like this, intentions with respect to these funds, what shareholders of these funds hope to get out of the funds. Those are all relevant facts. In addition to that- Why would you put in information about Saba's history? I mean, that seems to me irrelevant to the ICA. This is like character information? I think it's entirely relevant to, just to step back here. The problem that funds have with these sorts of activist investors is that they come in- Are you using that in the pejorative sense, activist investors? Do you think it's a pejorative? I think they would describe themselves as activist investors. They would describe themselves if they wouldn't be in a pejorative manner, if they would think it was okay. Without characterizing it one way or another, I think the conduct that investors like Saba engage in is inconsistent with the interests of long-term shareholders in funds like Nuveen. These are funds that people invest in because they produce long-term, high-dividend returns. The way that they do that is by being fully invested. Unlike, say, a typical ETF, they don't have just cash on hand. And what happens when, as a result of that, their trading price may be below their net asset value? That's what creates the arbitrage opportunity for funds like- Was this a problem from 2010 to 2020 when the CCE said it was not going to act on this type of amendment? I think these same sorts of things were happening between 2010 and 2020. But again, that bolder letter has since been withdrawn, so I don't think that tells us what- I guess I'm somewhat concerned about the policy implications here, which I don't fully understand. And I'm wondering, would it make sense to ask the SEC's views to understand why the interpretation was changed or what its position is today? I think without regard to the SEC's view, I think our statutory interpretation argument is correct. But obviously, if the Court were inclined to ask for the SEC's view, the Court has the discretion and the authority to do that, of course. You've reserved a couple minutes for rebuttal. Thank you. Thank you. Thank you. Your Honors, good morning, and may it please the Court, Mark Musico on behalf of the Plaintiffs' Appeas. Nubian's adoption of control share provisions plainly violates Section 18I's mandate of equal- that every share of common stock of a registered investment company be voting stock with equal voting rights. It doesn't say except for activist investors, does it? Did you say that in 18I? It doesn't say except for activist investors? Exactly, Your Honor. It is unequivocal and unqualified. It does not make any exemptions for the type of investor or the type of holder. And specifically with respect to Nubian's purported shareholder distinction, the definitions, to the extent there is any ambiguity in Section 18I itself, the definitions in the Act, specifically Section 2A42 and 2A36, define a voting stock specifically with reference to whether the stock entitles the holder of it to vote. And so certainly, as Your Honor asked Nubian's counsel earlier, Congress could have adopted a scheme more similar to the Delaware provisions that allow certain funds to modify voting rights or discriminate amongst holders as long as those provisions are in their Certificate of Incorporation. But Congress explicitly chose not to do so in Section 18I. So if we agree with you in the district court, I guess, what does that do to Baker and other state control share statutes? Does that mean that they're all protected by the SEA? So, Your Honor, affirming a district court in this case would have no influence on a case like Baker. It does not affect the ability of states to permit discrimination among shareholders in certain circumstances. It may well call into question control share statutes adopted by certain states. That's obviously not before the court today. But to the extent it does, this court should have no reservation about doing so because, as Your Honor pointed out earlier, the closed end fund world has operated perfectly well from 2010 until 2020, and actually even before 2010, when these sorts of control share provisions were not available to them. I mean, I don't know the answer. And so I guess I'm asking you the same question. Do you have anything you can tell us about the SEC's views, change in views and position today? Your Honor, all we know about the SEC's views from the 2020 letter withdrawing the 2010 Boulder letter is that it did not include any legal reasoning and explicitly stated it is without legal force and effect. The only reasoned position of the SEC that we have on this issue is in the 2010 Boulder letter. Could I ask you to take a step back for a second and go to the standing issue for a second? It strikes me as a touch curious that you have no contract to purchase a share at this moment in time, do you? To purchase additional shares? No, Your Honor. And although the statute talks about that voting shares will have equal voting rights, what's the remedy that's made available under the statute? Rescission. Exactly, Your Honor. But it's rescission of a contract for the purchase of a share, is it not? So, Your Honor, the- So what's the court to do? There's no contract to buy anything. If there were a contract, the court would have a remedy, but what's the court to do? Your Honor, the contracted issue here is the bylaws that are being adopted. And these funds are Massachusetts business trusts. Massachusetts law is clear that a fund's bylaws are contracts between the funds and the shareholders. Except that this restriction doesn't affect anything you currently own, so it's something that you're going to own, right? That's correct, Your Honor, but- But now you're on notice that if you buy something, it would be subject to this amendment, so you sort of know what you're going to get. So what's the- So, Your Honor, there are a few forms of injury that we've articulated in our briefs. First, specifically with respect to the loss of voting rights, it's hard to imagine a more imminent loss of rights than the fact that only a single additional share would have triggered the control share provisions. And this Court and the Supreme Court's precedents are clear that a party does not need to subject itself to injury in that fashion in order to have standing, so long as injury is, in fact, imminent. And again, it's hard to imagine anything more imminent than a single share. Your Honor, this is the only answer as to whether a majority of the other shareholders will save you from your disability. So, with respect to that, Your Honor, that goes to the importance of not blending standing with the merits. And as the District Court appropriately found, even the additional procedures needed to potentially restore voting rights create an asymmetry in the rights of shareholders that violates the equal voting rights mandate. And this is not academic, Your Honor. Those procedures are extraordinarily onerous. In addition to having to request the meeting, there is an exceptionally- Every other shareholder has to vote, right? Every other shareholder gets to vote. The rest of the shareholders get to vote. The interested shares are not counted. But the voting standard is extraordinarily high, if not impossible to reach. The party requesting the procedure needs to cover the costs of the additional election, which are onerous. I'm sorry. I apologize for interrupting you. Finish your statement. No, I was just- I'm not sure I even had a last point after that, Your Honor, so please. Are your control shares counted in what constitutes majority? In other words- In the subsequent- In the denominator? In the restoration procedures? Yeah. No, they're not. And that's in the board resolution? That is in Section 9 of the amended bylaws, which are the control share- It would make it even harder to achieve a victory under those circumstances, given that your shares wouldn't even count as part of the vote, would they? Exactly. You're right, Your Honor. I think we're still on standing, but under TransUnion, what's the common law analog to the injury that you're claiming? So, Your Honor, to start, I don't think TransUnion specifically holds that there must be a common analog, but that you look to common law analogs to determine whether there has been a concrete harm. But even taking the premise of your question, Your Honor, Nuveen has certainly cited to no case finding that interference with voting rights is not a sufficiently concrete harm. I think that's backwards. I think standing is on you. Well, and, Your Honor, we have certainly cited to a number of cases in our brief, it's page 30 of our brief, from both federal and state court in which shareholders are regularly bringing suit not just recently to vindicate harms to or interferences with their voting rights. So I'm not hearing a common law analog. So I guess your position is you don't need to because this is a traditionally recognized concrete. Well, in state court actions, Your Honor, they may very well be suits at common law. But regardless, I do think we are far afield in this case from the caution of TransUnion and Spokio in terms of Congress opening up the courts to abstract injuries or allowing anyone on Earth to bring suit to vindicate any federal law. The simple fact that Soledge's credit report was wrong didn't translate to the fact that they were then subsequently injured because it wasn't connected to being denied credit or something else. The court required something else. That's a little different than evaluating whether your voting rights, which are traditionally recognized in a corporate structure, although some states allow varying levels of participation, is somewhat different. And this statute recognizes an equality of right. Exactly, Your Honor. This is not an abstract procedural harm. This is a specific harm articulated by Congress. TransUnion, in fact, specifically calls out Congress's ability to elevate discriminatory treatment as an intangible interest that Congress has elevated to the status of a concrete harm. That's in TransUnion 144 Supreme Court at 2205. Spokio is also clear that Congress has the ability to articulate or clarify chains of causation. And here Congress has specifically done so with respect to investment companies, implementation of discriminatory provisions or provisions that fail to protect the privileges of their shareholders. Congress specifically drew a causal link between those sorts of entrenchment mechanisms and harm to investors in federally registered investment companies. Again, Saba is not some sort of passive observer here who is trying to vindicate some sort of abstract procedural right. Saba is a party to a contract with this federally registered closed end fund that has been rendered illegal by the fund's adoption of these discriminatory voting provisions. I go back to the shareholder share distinction that your adversary focuses on. Would you agree that there is such a distinction that is that an act on a shareholder only would be allowed under the ICA? Your Honor, to the extent any such distinction has ever been recognized, it has been a product of positive law affirmatively enacted by legislatures such as the statute enacted by Delaware. As a background principle of common sense, it's difficult to see the distinction. Shares don't vote. Shareholders do. And so that's why I think we have... Your Honor, there is that that is a false distinction that shareholders can act only through the holding of shares. I think unless a legislature is specifically telling us otherwise, it's impossible to see the distinction between the two. And fortunately for us, in the text of the Investment Company Act, Congress has specifically told us that it is linking the rights of a voting share to entitling the holder of that share to vote it. And so there's no ambiguity that Congress has adopted a different scheme than the type that Delaware adopted. Specifically with respect to this unique form of investment company, right? We're not talking about the world of public operating companies. We're talking about a very specific sector of the financial industry where Congress found that these types of discriminatory provisions were rife for abuse. Counsel, I had a discussion with opposing counsel about balancing the equities before granting rescission. Do you think that the district court met the test of Section 8046B2? Yes, Your Honor, for a few reasons. First, beginning with the one that Judge Park mentioned, the statute is framed in a... It is. But we have to presume that that was meaningful, and it is. So the statute creates at least a presumption in favor of rescission, if not a directive to grant rescission, unless certain conditions are met. And so as Judge Park's question implied, you don't even get into the two factors unless you're considering denying rescission. But even if you're considering the rest of the test, there are two conditions that must be satisfied in order to deny rescission. First, the denial must produce a more equitable result. And second, the denial must not be inconsistent with the purposes of the Investment Company Act. And the district court here clearly and correctly found that the adoption of these control share provisions were inconsistent with the purposes of the Act. Specifically, it cited the Boulder Letter and the purposes articulated in Section 1B3 of the Act that made clear that Congress wanted... was to prohibit these types of discriminatory provisions and to protect the preferences and privileges of the holders of the securities. There is an absolutely clear conflict with that purpose of the statute, and as a result, the district court appropriately could not deny rescission. So you don't think we should remand so that he could mention the sanction? I think... That seems more formulaic than real. Both as a legal matter, Your Honor, I think a remand would be inappropriate and unnecessary. To the extent there is any question, I think this would be an obvious case for harmless error, in the sense that Nuveen presented, by its own argument, trying to argue against forfeiture. Nuveen presented these policy considerations to the district court. It had an evidentiary record. While Nuveen now claims that it should have been allowed additional discovery, it did not submit an affidavit as required under Rule 56D in terms of what additional discovery it could have possibly wanted. The generalized policy concerns that Nuveen wanted to raise before the district court involved information that was already fully available to Nuveen, or to the extent it was in the possession of one party as opposed to the other, it was in Nuveen's possession. And so anything that Nuveen wanted to put in the record before the district court on summary judgment, it could have and should have done so below. Unless Your Honors have any further questions, thank you for your time, and we request that you affirm. Thank you, counsel. Mr. Brzezinski, you have a couple minutes. Excuse me. Thank you. Let me start quickly with the site, Judge Wesley, that you requested. It's joint appendix 319, section 9.3 of the bylaws. That talks about how a shareholder can request an immediate vote in order to determine the voting rights. With respect to the withdrawal of the Boulder letter, the SEC's withdrawal of the Boulder letter is in the joint appendix at 279. So you can see there what the reasoning was. I'd underscore that in that withdrawal letter, the SEC notes that 25 states have these sorts of control share statutes. And so this is a well-understood distinction between shares and shareholders. The other thing that the withdrawal letter notes, this is at JA-280, is that the withdrawal was also in light of changing market conditions. Those changing market conditions include the rise of activist fund activity like SABA. Now, I think SABA acknowledges that there can be such a thing as the shareholder distinction. Conceptually, this is a thing. I think the question is whether that is what Congress did in this statute. And I think the contrast between 18I and 12D shows that Congress, in fact, did enact this share-shareholder distinction. Because 18I talks about no restrictions on shares and stock. 12D is a restriction on shareholders. So obviously, Congress thought those two things could coexist. And there's nothing inconsistent between 18I and what the funds have done here. With respect to the word presently in the definition of a voting security, I'd point the court in particular to pages 24 to 25 of our requi-brief. Where we explain the function that that word presently is doing. It's distinguishing between stock, which can be presently voted, and options, which can't be. Since both stock and options are securities, saying that only a presently votable security is a voting security is significant. With respect to transunion, I think the Supreme Court's guidance there is clear. There has to be a close relationship between the cause of action and a harm cognizable at common law. SABA hasn't pointed to any common law cases that have that kind of a close relationship. The cases that they cite in their brief are ones that predate transunion. And then lastly, with respect to the rescission point, a remand would not be formulaic. This is an equitable determination. Equitable determinations are based on facts. And the district court necessarily errs in a reversible way when it doesn't even conduct that balancing. Thank you. Thank you both. Well briefed. Very well briefed. Thank you. Thank you. Case under advisement.